The TRAVELERS INSURANCE CO., Appellant,

v.

Manson S. BEARDEN, as n/f of Michael L. Bearden, Appellee.

No. 16227.

Court of Civil Appeals of Texas.

Dallas.

Oct. 18, 1963.

Rehearing Denied Dec. 6, 1963.

Thompson, Knight, Wright & Simmons, Pinkney Grissom, Rust E. Reid and John A. Gilliam, Dallas, for appellant.

Mullinax, Wells, Morris & Mauzy, Dallas, for appellee.

BATEMAN, Justice.

Our former opinion is withdrawn and the following substituted therefor.

Workmen's Compensation case. The employee, Michael L. Bearden, will be spoken of herein as the appellee even though, being a minor, he was represented in the litigation by his father as next friend. In his suit to set aside the award of the Industrial

Accident Board he alleged a total and permanent specific injury to his right arm, claiming the maximum weekly benefits for the statutory period of two hundred weeks. Art. 8306, Sec. 12, Vernon's Ann.Tex.Civ. St. Appellant specifically pled that the injury was limited to the hand and did not extend to the arm.

In answer to the first two special issues the jury found (1) that the injury to the plaintiff's arm resulted in a total loss of the use of said arm, and (2) that such total loss of use was permanent. Appellant's first complaint, expressed in its first four points of error, is that the trial court deprived it of its affirmative defense that the injury was limited to the hand by refusing to submit certain special issues and instructions requested by it. This contention is without merit and will be overruled.

The first of the said requested special issues was as follows: "Do you find from a preponderance of the evidence that *the injury to plaintiff Michael L. Bearden's arm* on the 17th day of March, 1961, has resulted in a loss of use of the hand of Michael Bearden as defined in this charge?" (Italics ours) The other requested issues inquired as to whether the loss of use was permanent or temporary and, if temporary, the period thereof, as to whether the loss will be partial, and if so whether such partial loss will be permanent or temporary and, if temporary, the period and percentage thereof. Appellant also requested the court to instruct the jury that the term "arm" included all of the arm commencing at or about the elbow and extending to the end of the extremity, including the hand and fingers; that the word "hand" meant all that portion of the arm below the elbow, including the hand and fingers; and "that loss of use to the 'arm' as defined, shall include loss of use to the hand, but that loss of use to the 'hand' as defined would be exclusive of any loss of use at or above the elbow."

■ The evidence was undisputed that all of the skin and all of the flesh down to the muscles had been peeled off from appellee's right arm from a point about three inches above the elbow to a point near the wrist. This was undoubtedly an injury to the arm, as defined in the Act, and though the incapacity or disability resulting from such injury may have been restricted or limited to the hand, it cannot properly be said that the *injury* was so restricted or limited. Sec. 12 of Art. 8306, V.A.T.S., under which the claim is made, authorizes awards for "the *injuries* enumerated in the following schedule * * *." (Italics ours). In a case like the present, where it is undisputed that the *injury* itself is to the arm rather than being limited to the hand, a showing that the resulting *loss of use* may be found only in the hand will not have the result of reducing the number of weeks of benefits from 200 to 150, but will at most only suggest a finding that the injury resulted in a partial rather than total loss of use. Therefore, we hold that, even though appellant did plead that the *injury* was limited to the hand, it is undisputed that the *injury* was not so limited, from which it follows that the requested issues were not raised by the evidence and were properly refused. Likewise, the requested instructions were immaterial and properly refused. "Injury" and "incapacity" are not synonymous. Federal Underwriters Exchange v. Simpson, Tex.Civ. App., 137 S.W.2d 132, no wr. hist.; Superior Ins. Co. v. Owens, Tex.Civ.App., 218 S.W.2d 517, err. dis.; Consolidated Underwriters v. Langley, 141 Tex. 78, 170 S.W.2d 463.

■ Appellant's second contention, embodied in its fifth, sixth, seventh and eighth points of error, is that the court erred in submitting Special Issue No. 2, in answer to which the jury found that the total loss of the use of the arm was permanent, and in rendering judgment on said verdict because, it is asserted, there was no evidence to support same, the evidence was insufficient, and the finding was so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.

These points we also find to be without merit and they are overruled.

The appellee testified that he was a high school graduate, was nineteen years old at the time of his injury, being strong enough to lift his father, (a paraplegic weighing 200 pounds) to the bathroom; that when his hand got caught between the rotating steel dough rollers the thickness of his wrist stopped the arm from going on through, but that the rollers continued to rotate and tore his skin and flesh loose from a point about three inches above the elbow, the bone itself being exposed. He was taken to the hospital where Dr. Clayton, called by the employer, cleaned up the arm and repositioned the flesh and skin back on the arm, bandaged it heavily, and put him to bed. Approximately eight days later the doctor found that the skin had died and removed it and replaced it with a graft taken from appellee's right thigh, which graft goes completely around the arm between the limits mentioned, and covers it completely. The skin graft has no feeling whatsoever on the exterior and since his injury he cannot participate in competitive contact sports. He tried working for a wood preservation plant loading poles on trolley cars but after one day he had to quit because he got creosote on his injured arm which made it burn and hurt a great deal, and he just couldn't do that manual type of labor. He didn't find a job for some time but was later employed as a brick mason's helper at $1.30 per hour (which was 20 cents per hour less than was paid to the other bricklayers' helpers and 65 cents per hour less than he was earning when injured), filling wheelbarrows and pushing them around and also driving a pickup truck, but he usually overturned the wheelbarrows because his right hand would "give out." He worked for the brick mason only a week as the employer used the other men who were better qualified. The extended use of his arm in that work caused him a great deal of pain, and the chemicals in the cement caused his arm to burn. He earned only approximately $300.-00 during the period from mid-July, 1962 until mid-September, 1962.

He further testified that he had lost a great deal of strength in his arm, that the reflex therein isn't perhaps as speedy as in the left arm, that he cannot muster enough strength to push the pushbutton to open the door on a modern car, that his right arm is of no use to him in opening a large or heavy door, that he can't hold objects in his right hand for a long time, that the arm weakens and the muscles often lock and he will have to pry them open with the other hand, that oftentimes when he uses the arm for any extended length of time a great deal of pain accompanies the use and for perhaps a day or two thereafter the arm aches a great deal and hurts. He cannot cut his food effectively at the dinner table and cannot help his father any more. The skin that was grafted on his arm does not perspire or grow any hairs and has no feeling whatsoever. Some time in the year before a boy dropped a cigarette on his arm when he had his head turned, which he did not notice until someone told him that his arm was burning, but that he could not feel it. Any time the arm came in contact with anything it broke easily, blood would come out and scabs would form over it. He said he does not have full extension of the arm, that at least 80% of the functioning ability of the arm is absent, and that in making this evaluation he referred to the "cosmetic and all that."

He further stated that he couldn't do the work he was doing when injured because of weakness in the arm; that his arm improved for a time, but reached a "levelling off period, where it didn't improve from that point on." $\frac{4}{5}$ths of the usefulness of the arm is gone, even though he can drive a car and can dance, can work, can type and can write. He can lift only one-fourth to one-third as much weight with his right arm as with his left. He further testified that, although he could drive a truck and his injured arm did not give him any particular trouble in the task of a truck driver, he

did not have enough strength in his right hand to turn on the ignition. He can handle a truck a little bit more effectively than a man who had lost his arm. He does not engage in athletics because the arm is rather unsightly, there has been a great psychological effect and he doesn't particularly like to wear short sleeved shirts that will expose the arm. He does operate a self-propelled power lawnmower and drives his father around in their family car. He is able to write legibly with his right hand although pain occurs and the fingers cramp after an extended time of writing. He types with both hands but his right fatigues after a time. He estimates that he is 80% disabled, meaning 80% of the use of the arm as opposed to a good arm or the arm before the injury, that his arm is only 20% as good now and 4/5ths of the usefulness of the arm is gone.

His father, Manson S. Bearden, estimated that his son uses his right arm 85% less than he did before it got hurt.

Dr. Ruth Jackson's written report, in evidence without objection, stated that on January 25, 1962, ten months after the injury, the skin graft was very irregular and very ugly in appearance, although it had been properly done; that the patient lacked 15 degrees of extension of the elbow, that there was no limitation of flexion or extension of the wrist but flexion of the wrist causes discomfort in the wrist, that there appears to have been some loss of tissue at the distal portion of the grafted area, a definite loss of substance of the muscle tissue; that because there was no sensation in the skin graft it would be inadvisable for him to participate in sports or to use his arm in any way which might endanger the grafted area; that he had marked weakness of the muscles of the forearm, and that he has a 25 to 35% permanent partial disability of his arm; that the cosmetic appearance of the arm cannot be evaluated in terms of percentage, but that certainly this should be taken into consideration.

Dr. Stanley L. Clayton, who was the treating doctor, testified that the machine had apparently just peeled the skin down like peeling a sleeve off, that it had completely encircled the arm so that there was no flesh on the muscles at all, the muscles were completely bare from this point slightly above the elbow to just above the wrist. He sewed the skin back in place with a full realization that it probably wouldn't survive because the blood supply had been so mangled and stripped away from it. X-rays revealed no fractures or other bony injuries. Some of the skin that had been peeled down survived but the rest of it died and this portion had to be surgically removed, meaning that all the dead skin and the dead fat down to the live tissues underneath had to be cut away and the muscles pretty well laid bare again. They grafted the entire raw surface with skin from his right hip; and when appellee was released from the hospital on April 18, 1961 he could use his right hand and arm although he had considerable residual weakness because of nonuse during the period of hospitalization, not having more than 35% of normal function of the arm and hand at that time. He examined Michael in August, 1961 when he still had some residual weakness and some mild stiffness of the elbow and wrist. His extension and flexion at that time were about 90% of normal, with a slight limitation in the wrist movement, and he would say there was then about 10% disability in both the wrist and the elbow. The grafts at that time were healing, and he advised Michael not to play football or to engage in any other athletics of that violent a nature because this skin graft is skin directly on muscle, that to a slight degree subcutaneous tissue will build up underneath it. This is fatty tissue that forms a cushion or padding so that when one gets bruised his muscle doesn't get bruised so quickly and the skin doesn't take such a beating because there is a soft cushion under it. When he released Michael around the first of the year 1962 he had improved to the point where he felt that

his only disability was cosmetic, that he had full extension and flexion of both the elbow and the wrist and the hand was fully usable, and that no further treatment was necessary.

He further said that on August 28, 1962 all of the skin graft had survived and was mature, completely and thoroughly healed with no ulceration or soreness of any type. He found the flexion and the extension normal and found only a very faint difference in the strength of the grip in the two hands. He would not have any reservations about sending appellee into an industrial complex to perform manual labor except that he would not want him around a lot of very noxious fumes, acids, alkalies, creosote or anything of a very corrosive nature. He would not want him to engage in sports like football where he would slide on the arm and possibly scrape all of the skin off again, but the normal industrial heavy use of the arm wouldn't be dangerous. He had originally noticed some atrophy or weakness in the muscles but by December, 1961 most of that had disappeared, and in August, 1962 all of the muscular atrophy had disappeared, but because of the lack of subcutaneous fat the right arm is smaller. He does not expect the cosmetic condition of the arm to change, and due to the lack of the protective layer beneath the skin he thinks a scratch or mild trauma on the arm, or a bruise, would be more severe than it would on the other arm, that a trauma that might not hurt anyone else at all might be somewhat more serious to him; his skin would be slower to heal and could ulcerate to some extent. If any infection results from an injury in the area of the skin graft it will possibly be more difficult to cure it.

Dr. Clayton testified on cross examination that when the skin was stripped away it had lost about 90% of its blood supply, that tiny arteries that supply the skin and several major veins that drain the arm were completely severed; that practically all of the subcutaneous nerves in that area were also torn away, that these nerves carry the sensation of heat, touch and pain, and that a tiny injury on this arm might not heal as fast as an injury on normal skin, and there might be a tendency for it to ulcerate where normal skin would not. He would say that 40 to 50% of the sensory nerve fibers of the entire arm had been destroyed; that appellee might not detect extreme heat or extreme cold applied to that portion of the arm covered by the skin graft as quickly and as acutely as a man with a normal arm would. There were muscle fibers which had been lacerated and it was necessary to cut away small pieces of muscle and a tendon that obviously might not have survived. He thinks appellee's resistence to injury and infection is greatly lessened, and that the capacity to perspire or grow hairs on the grafted area is greatly reduced. While he would not want to force appellee to go back to the same work he was doing when injured, because of his psychological reluctance to do so, he does not see any reason why he couldn't perform the job he was performing at that time.

We have carefully studied and carefully reviewed all of the evidence for the purpose of determining, first, whether there is *any* evidence and, second, whether the evidence is sufficient, to support the jury finding that appellee suffered total and permanent loss of the use of his right arm. The foregoing summary of the testimony bearing upon this issue clearly shows that there was at least some evidence to support the finding, and we are unable to say that the finding is so against the overwhelming weight of the evidence as to be manifestly wrong and unjust.

In defining the term "total loss of use" as used in the court's charge the court correctly told the jury that the phrase means that "the member is so affected as to substantially and materially impair the use thereof, in the practical performance of its functions in the pursuit of a laboring man." Appellant does not question the

correctness of this definition. It will be observed that the court did not instruct the jury that the term "total loss of use" meant that the member is so affected as to *destroy* the use thereof, but only as to substantially and materially *impair* the use thereof.

The Supreme Court, in Travelers Insurance Co. v. Seabolt, Tex., 361 S.W.2d 204, said: "Although a member may possess some utility as a part of the body, if its condition be such as to prevent the workman from procuring and retaining employment requiring the use of the injured member, it may be said that a total loss of the use of a member has taken place."

■■■ It was the jury's prerogative and duty to hear all of the testimony, observe the demeanor of the witnesses on the stand, look at the claimant's arm and "use their common sense upon all the evidence and draw the same conclusions from their observance of physical conditions, personal appearance, and the value of human testimony, as other rational persons in like circumstances might do; they were not limited to the mere conclusions of the two physicians, however buttressed by professional learning and experience." Oilmen's Reciprocal Ass'n v. Harris, Tex.Civ.App., 293 S.W. 580, 582, no wr. hist.

Appellant relies upon a number of Texas cases in support of its position, particularly the opinion of this court in Texas Employers Ins. Ass'n v. Vineyard, Tex.Civ.App., 316 S.W.2d 156. In the cited case the employee held a number of good jobs for a number of years after his injury and up to the time of trial, and had received several promotions and increases in pay. No such showing was made in this case. We have studied all of the authorities cited by appellant and find none of them to be in point on this question so far as the facts are concerned.

Affirmed.